**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| MARY ELKINS, | : | |
| | : | |
| Plaintiff, | : | Civil Action File No.: |
| | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| ROMAN CATHOLIC | : | |
| ARCHDIOCESE OF ATLANTA, | : | |
| INC., | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

COMES NOW Plaintiff, Mary Elkins, by and through her undersigned counsel, and hereby files her Complaint, showing the Court as follows:

### Parties

1.     Plaintiff Mary Elkins ("Plaintiff" or "Ms. Elkins") is a 68-year-old woman and, at all times relevant to this case, was a resident of Georgia.

2.     Defendant the Roman Catholic Archdiocese of Atlanta, Inc. ("Defendant" "The Archdiocese" or "The Archdiocese of Atlanta") is a domestic non-profit corporation headquartered at 2401 Lake Park Drive, SE, Smyrna, Georgia 30080, and at all times relevant to this case, has conducted business in Fulton County. Defendant can be served through its registered agent for service of

process, Stephen M. Forte, located at 1230 Peachtree Street NE, Suite 3100, Atlanta, Georgia, 30309.

3.      Defendant is qualified and licensed to do business in Georgia, and at all times relevant hereto, has conducted business within this District.

4.      Plaintiff is an eligible employee under the Family and Medical Leave Act who has worked at least 1,250 hours in a year at a worksite with at least 50 people in a 75-mile radius in the final 12 months of her employment pursuant to 29 U.S.C. § 2611(2).

## Jurisdiction and Venue

5.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over all Counts of this Complaint, which arises out of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq*. ("ADEA"), the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12112 *et seq*. ("ADAAA") and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"). Plaintiff asserts claims of age discrimination under the ADEA, discrimination under the ADAAA, and for retaliation under the ADEA and FMLA. Plaintiff seeks injunctive and declaratory relief, back pay and lost benefits, front pay or reinstatement to a full-time position with commensurate benefits, compensatory damages, liquidated damages, punitive damages, attorneys' fees and costs of litigation.

6.     Venue is proper in this Court because the unlawful employment practices described herein occurred within the Atlanta Division of the Northern District of Georgia.

7.     On December 14, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") naming Defendant as the respondent.

8.     On January 29, 2020, the EEOC issued Plaintiff a notice of right to sue.

## Statement of Facts

### *Plaintiff's Credentials, Hire, and Supervisors*

9.     Plaintiff has been an employee of The Archdiocese since April 1997, when Defendant hired her as a full-time employee for then Archbishop John F. Donoghue at his residence. Plaintiff was originally hired pursuant to a contract of employment. The contract contained severance benefits. However, after Ms. Elkins informed The Archdiocese of her cancer diagnosis, the contract expired, and Ms. Elkins was informed by Bishop Joel Konzen and Human Resources Director Chuck Thibaudeau that the contract would not be renewed and she was an employee at will.

10.     Plaintiff worked for The Archdiocese for twenty-three years, most recently as an Event Planner reporting directly to Deacon Dennis Dorner.

11.     In this role, Ms. Elkins was responsible for all logistical and procedural

activities associated with the planning and execution of special events under the direction of the Office of the Archbishop and/or the Office of the Chancellor, or any other Archdiocesan offices or departments when so assigned by the Archbishop or the Chancellor. In her role as an Event Planner, Ms. Elkins was not responsible for and had no input into the religious content of any events, never performed religious duties, or played a vital part in carrying out the religious mission of the Roman Catholic Church.

12.    Ms. Elkins' duties included but were not limited to: arranging for onsite and offsite event space, RSVP to invitations, transportation, décor, food, and beverage; coordinating onsite events hosted by external parties; coordinating and advertising all pilgrimages, domestic and abroad, sponsored by the Archbishop's Office; proofreading communications and researching, vetting, and obtaining contractual services of all principal providers.

13.    Ms. Elkins' duties were strictly clerical, not ministerial. She did not represent The Archdiocese in any ministerial or liturgical capacity, nor did she receive any religious training or ordination of any type from The Archdiocese or otherwise to perform her job duties. Throughout her employment with The Archdiocese of Atlanta, Ms. Elkins never led The Archdiocese, conducted worship services or important religious ceremonies or rituals, or served as a messenger or

teacher of Roman Catholic theology or faith.

14.    During 2020 when numerous events were cancelled due to the pandemic, live activities at The Archdiocese of Atlanta continued, which would have required Ms. Elkins to work in her capacity as an Event Planner.  In addition, events by videoconference were scheduled.

15.    As the Event Planner, Ms. Elkins was involved in scheduling, coordinating, and posting advertisements of the aforementioned events.

16.    Additionally, as part of her job duties, Ms. Elkins decorated the Archbishop's residence and the Catholic Center.

17.    Ms. Elkins' responsibilities increased during the pandemic as she and The Archdiocese followed the CDC guidelines for social distancing. Indeed, additional protocols due to the Covid-19 pandemic were used at all events, creating additional work for Ms. Elkins.

18.    Ms. Elkins met with Archbishop Gregory Hartmayer on November 17, 2020 and reviewed the calendar for the next 6-8 months and he confirmed The Archdiocese would be having numerous events, all of which were events Ms. Elkins would have coordinated, had she not been fired.

19.    Archbishop Hartmayer has recently instructed all healthy Catholics to return to Mass. That too would have required planning and coordination by Ms.

Elkins, particularly regarding compliance with Covid-19 protocols.

20.     Group gatherings in The Archdiocese are increasing, which require the expertise of an Event Planner, especially during a pandemic.

21.     In all her years of service, Ms. Elkins has never been disciplined or received an unsatisfactory performance review or negative job feedback.

22.     In a December 3, 2020 email, Chuck Thibaudeau, the Director of Human Resources, described Ms. Elkins' work product as "exceptional."

<u>*Plaintiff's Cancer Diagnosis and Treatment*</u>

23.     In January of 2017, Ms. Elkins was diagnosed with pancreatic cancer and underwent surgery to remove part of her pancreas.

24.     Ms. Elkins required another surgery on March 14, 2017 and has been required to undergo radioactive gallium scans every four months to measure the growth of the tumor.

25.     On October 23, 2020, Ms. Elkins had the first of an ongoing series of monthly injections to treat her pancreatic cancer.

26.     In an email dated November 17, 2020, Ms. Elkins asked Archbishop Hartmayer to "please keep me in your prayers as I have my second cancer treatment this Thursday."

27.     Archbishop Hartmayer received Ms. Elkins email of November 17,

2020 and replied to it.

28.    Ms. Elkins had another procedure on November 20, 2020.

29.    She will require these monthly injections for the rest of her life.

30.    Everyone in Archdiocesan leadership, including the Archbishop, is and has been aware of her diagnosis and need for continuing treatment.

*Defendant Interferes with and Retaliates Against Plaintiff for Needing to Undergo Cancer Treatments*

31.    Following her second 2017 surgery, Ms. Elkins' then-supervisor, David Spotanski, was not sympathetic to her taking time off to heal and continually warned her that she needed to be at the office every day.

32.    When Ms. Elkins explained that she was having horrible diarrhea and could not make it all the way to work without stopping several times, Chief Operating Officer Spotanski stated, "You old timers all think you run this place. Well, you don't, and that's going to change!"

33.    Spotanski's response prompted Ms. Elkins to request a change of supervisor from Spotanski to Deacon Dennis Dorner. The change was granted by Bishop Joel Konzen, as he was familiar with Spotanski's discriminatory harassment toward another older employee.

34.    This was not the only time that The Archdiocese or its managers expressed annoyance at employees' requests for medical leave or treatment.

35.     The Archdiocese is self-insured with additional coverage from Catholic Mutual and when a former administrative assistant, Kathy Owens, was undergoing treatment for a brain tumor, Brad Wilson, the Chief Financial Officer, told her she was costing The Archdiocese a lot of money.

36.     Wilson made similar statements to others undergoing extensive and costly medical treatments.

37.     These statements were documented by Deacon Dennis Dorner who presented them to former Archbishop Wilton Gregory, who failed to act on them.

38.     On information and belief, The Archdiocese's Finance Office received the medical insurance bill for her October 23, 2020 treatment in the weeks following this procedure and before November 15, 2020.

*The Archdiocese Terminates Plaintiff*

39.     On November 17, 2020, Deacon Dennis Dorner informed Ms. Elkins that he met with Chuck Thibaudeau, Brad Wilson, and Bishop Joel Konzen who directed him to terminate Ms. Elkins that week.

40.     According to Deacon Dorner, he asked them why he was not consulted about Ms. Elkins' termination and told them that he believed her services were still needed, he did not understand this decision because his department was under budget, and Ms. Elkins had just begun a new cancer treatment.

41.    Thibaudeau allegedly informed Deacon Dorner that Ms. Elkins should go on Medicare and that the termination decision was "what the Archbishop wants and it was his decision."

42.    On November 18, 2020, Deacon Dorner emailed Ms. Elkins a letter dated November 20, 2020 terminating her employment with The Archdiocese effective December 21, 2020.

43.    On the day Ms. Elkins was terminated, The Archdiocese fired another cancer patient, a male over age 70, an employee who had numerous medical procedures, and a pregnant employee.

44.    On November 19, 2020, Bishop Konzen telephoned Ms. Elkins and explained that he had found out about the termination decision only that week and had asked for her to be retained on a part-time basis, but that The Archdiocese denied his request.

45.    The Catholic Church in the United States received at least $1.4 Billion Dollars as the result of applying for funds pursuant to the CARES ACT.

46.    On information and belief, The Archdiocese of Atlanta received substantial funds from the CARES ACT in 2020. Despite receipt of these funds, the purpose of which is to support employers in retaining employees, The Archdiocese terminated Ms. Elkins.

47.     Despite citing a reduction in force in Ms. Elkins termination letter, Archbishop Hartmayer had enough money to add a luxury sunroom to his house. This expenditure was approved by the Finance Office headed by CFO Brad Wilson.

48.     And although it represented that it was having a reduction in force in Ms. Elkins' termination letter, The Archdiocese continues to hire new employees and new duplicate employees in the Archbishop's own office. This expenditure was approved by the Finance Office.

49.     During this time period, Catholic Charities, which is controlled by The Archdiocese, was running an advertisement for an Engagement Marketing Specialist. Although many of the skills listed in the advertisement were held by Ms. Elkins, she was not offered this position.

50.     No attempt was made to find Ms. Elkins a job within The Archdiocese or at a parish located within the boundaries of The Archdiocese.

51.     The Archdiocese has numerous positions where it has duplicate staffing, including but not limited to the Office of Vocations, the Archbishop's Office, Bishop Bernard Shlesinger III's Office, and at the time of Ms. Elkins' termination, Bishop Konzen's Office.  None of these positions were eliminated.

*Plaintiff's Supervisors' Age, Disability and Medical Leave Animus*

52.   During this same period, The Archdiocese also terminated other older employees or those with a need for continuing and potentially costly medical care.

53.    The Archdiocese terminated Deacon Ray Egan, who is over the age of 70 and undergoing cancer treatment.

54.   The Archdiocese terminated Deacon Dick Tolcher, who is over 70.

55.   The Archdiocese terminated Patricia DeJarnet, who is over 70, had multiple medical procedures, and was given an option to be terminated or retire in May 2021.

56.   The Archdiocese terminated Shannon Gerard, who was pregnant at the time.

*Plaintiff's Damages*

57.   Due to Plaintiff's termination, she has been unable to find work.

58.   As a result of Defendant's conduct, Plaintiff's career has been derailed. She has and continues to suffer lost wages.

59.   Defendant's conduct has caused Plaintiff extraordinary emotional distress, emotional pain and suffering, inconvenience, humiliation and embarrassment.

60.   As a result of Defendant's conduct, Plaintiff has incurred attorneys'

fees and expenses.

## COUNT I
## AGE DISCRIMINATION IN VIOLATION OF THE ADEA

61.    Plaintiff incorporates by reference all the preceding paragraphs of the Complaint.

62.    Plaintiff is sixty-eight years old and, at all relevant times, was an employee protected by the ADEA.

63.    At the time of her termination, Plaintiff was more than qualified for the position she held based on her record of performance and length of service.

64.    Plaintiff's supervisors, including but not limited to Spotanski, Wilson, and Thibaudeau, harbored a discriminatory animus toward older employees.

65.    Spotanski, Wilson, Konzen, Thibaudeau, and Hartmayer, among others, discriminated against Plaintiff in violation of the ADEA by taking adverse actions against her, including but not limited to making ageist comments to or about her, interfering with her medical leave and treatment, and terminating her employment.

66.    In so doing, Defendant knowingly and intentionally discriminated against Plaintiff on account of her age.

67.    In taking these adverse actions against Plaintiff, Defendant unlawfully discriminated against her based on her age in violation of the ADEA.

68. Plaintiff is entitled to an award of back pay and benefits, front pay, liquidated damages, injunctive relief, attorneys' fees, and all other appropriate damages, remedies, and other relief available under the ADEA and all federal statutes providing remedies for violations of the ADEA.

## COUNT II
## DISABILITY DISCRIMINATION IN VIOLATION OF THE ADAAA

69. Plaintiff incorporates by reference all the preceding paragraphs of the Complaint.

70. At all relevant times, Plaintiff was an individual with a "disability" as defined by the ADAAA, 42 U.S.C. § 12102(1), because she (a) suffered mental and/or physical impairments that substantially limited one or more major life activities, (b) had a record of such impairments, and/or (c) was regarded by Defendant as a person with such impairments.

71. Plaintiff was at all relevant times a "qualified individual" as that term is defined by the ADAAA, 42 U.S.C. § 12111(8), because she was able to perform the essential functions of the job with or without a reasonable accommodation.

72. Plaintiff's supervisors, including but not limited to Spotanski, Wilson, and Thibaudeau, harbored a discriminatory animus toward disabled employees.

73. Spotanski, Wilson, Konzen, Thibaudeau, and Hartmayer, among others, discriminated against Plaintiff in violation of the ADAAA by taking adverse

13

actions against her, including but not limited to making comments about the inconvenience caused by disabled employees, interfering with her medical leave and treatment, and terminating her employment because of her disability.

74.    In so doing, Defendant knowingly and intentionally discriminated against Plaintiff in violation of the ADAAA.

75.    In taking these adverse actions against Plaintiff, Defendant unlawfully discriminated against her based on her disability in violation of the ADAAA.

76.    As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other benefits, including social security, all in an amount to be established at trial.

77.    Plaintiff is entitled to an award of back pay and benefits, front pay, liquidated damages, injunctive relief, attorneys' fees, and all other appropriate damages, remedies, and other relief available under the ADAAA and all federal statutes providing remedies for violations of the ADAAA.

78.    Defendant's actions were undertaken intentionally, willfully, and maliciously with respect to, or with reckless disregard for, Plaintiff's federally protected rights, and she is therefore entitled to punitive damages.

79.    In taking these adverse actions against Plaintiff, Defendant unlawfully

discriminated against her based on her disability in violation of the ADAAA, 42 U.S.C. § 12112(b)(4).

## COUNT III
## FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADAAA

80. Plaintiff incorporates by reference all the preceding paragraphs of the Complaint.

81. At all relevant times, Plaintiff was an individual with a "disability" as defined by the ADAAA, 42 U.S.C. § 12102(1), because she (a) suffered mental and/or physical impairments that substantially limited one or more major life activities, (b) had a record of such impairments, and/or (c) was regarded by Defendant as a person with such impairments.

82. Plaintiff was at all relevant times a "qualified individual" as that term is defined by the ADAAA, 42 U.S.C. § 12111(8), because she was able to perform the essential functions of the job with or without a reasonable accommodation.

83. Plaintiff sought an accommodation under the ADAAA when, among other things, she notified The Archdiocese of her cancer diagnosis, her need for ongoing monthly treatment and when she sought accommodation for recovery from treatment.

84. Defendant unlawfully failed to accommodate Plaintiff's disability when, instead of allowing her to continue working and seeking treatment, it made

ageist and threatening comments about her need for treatment and terminated her.

85.     By denying Plaintiff reasonable accommodations and instead terminating her employment, Defendant discriminated against Plaintiff because of her disability and violated her rights under the ADAAA, 42 U.S.C. § 12112(5)(A).

86.     Defendant's actions, in failing to accommodate Plaintiff's disability, constitute unlawful intentional failure to accommodate in violation of the ADAAA.

87.     As a result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, inconvenience, loss of income and benefits, including health insurance, humiliation, and other indignities compensable under the ADAA, for which Defendant is liable.

88.     Defendant violated the ADAA willfully, wantonly, and intentionally to harm Plaintiff and her federally protected rights.  Additionally, and in the alternative, Defendant acted with reckless disregard for Plaintiff and her federally protected rights and she is therefore entitled to punitive damages.

## COUNT IV
## RETALIATION IN VIOLATION OF THE ADAAA

89.     Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

90.     At all relevant times, Plaintiff was an individual with a "disability" as defined by the ADAAA, 42 U.S.C. § 12102(1), because she (a) suffered mental

16

and/or physical impairments that substantially limited one or more major life activity, (b) had a record of such impairments, and/or (c) was regarded by Defendant as a person with such impairments.

91.     Plaintiff was at all relevant times a "qualified individual" as that term is defined by the ADAAA, 42 U.S.C. § 12111(8), because she was able to perform the essential functions of the job with or without a reasonable accommodation.

92.     Plaintiff engaged in statutorily protected activity by, among other things, exercising or attempting to exercise or enjoy her rights under the ADAAA, including but not limited to, requesting a reasonable accommodation for her disabilities.

93.     Defendant unlawfully retaliated against Plaintiff, including, but not limited to, terminating her employment after she required frequent and costly medical treatment for her disability.

94.     Defendant's actions, in subjecting Plaintiff to retaliation for engaging in protected activity by among other things, seeking a reasonable accommodation for her disability, constitute unlawful intentional retaliation in violation of the ADAAA.

95.     Defendant's actions amount to violations of the ADAAA, which prohibits employers from discriminating against an individual because she has

opposed any act or practice made unlawful under the ADAAA, 42 U.S.C. § 12203(a), and also prohibits employers from coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of rights under the ADAAA on account of her having exercised or enjoyed or attempted to exercise or enjoy such rights, 42 U.S.C. § 12203(b).

96.     As a result of Defendant's unlawful actions, Plaintiff has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial as well as emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities compensable under the ADAAA, for which Defendant is liable.

97.     Defendant violated the ADAA willfully, wantonly, and intentionally to harm Plaintiff and in violation of her federally protected rights.  Additionally, and in the alternative, Defendant acted with reckless disregard for Plaintiff and her federally protected rights and she is therefore entitled to punitive damages.

## COUNT V
## INTERFERENCE IN VIOLATION OF FMLA

98.     Plaintiff incorporates by reference all the preceding paragraphs of the Complaint.

99.     Defendant is an employer covered by the FMLA pursuant to 29 U.S.C.

§ 2611(4)(A)(i).

100.   Plaintiff was an eligible employee under the FMLA pursuant to 29 U.S.C. § 2611(2).

101.   Following her surgery on March 14, 2017, Plaintiff was entitled to leave under the FMLA pursuant to 29 U.S.C. § 2612(a)(1), but Defendant engaged in prohibited conduct under the same by pressuring her to return to work and making ageist and threatening comments when she explained her need to convalesce and recover.

102.   On October 23, 2020, Ms. Elkins began to have monthly injections to treat her cancer, which she was entitled to under the FMLA pursuant to 29 U.S.C. § 2612(a)(1), but Defendant engaged in prohibited conduct under the same by terminating her rather than allowing her to continue them.

103.   Defendant's prohibited conduct constitutes an unlawful interference against Plaintiff in violation of Plaintiff's rights under the FMLA pursuant to 29 U.S.C. § 2615(a).

104.   By terminating Plaintiff's employment when she was entitled to take leave under 29 U.S.C. § 2612(a)(1)(C) and § 2612(a)(1)(D), and by considering her desire to take use of protected leave as a "motivating factor" in the decision to terminate her employment, among other actions, Defendant interfered with and

prevented Plaintiff from exercising the rights provided to her under the FMLA.

105.   The actions of Defendant in interfering with Plaintiff's leave under the FMLA were committed with reckless disregard for her right to take up to 12 work weeks of leave time or intermittent leave because of her serious health condition and in violation of 29 U.S.C. § 2612(a)(1)(C) and § 2612(a)(1)(D).

106.   The effect of the actions of Defendant has been to deprive Plaintiff of a job, as well as income in the form of wages, health insurance, prospective retirement benefits, social security, and other benefits as a result of her right to leave under the FMLA. Accordingly, and because the violations of the FMLA committed by Defendant, Plaintiff is entitled to both equitable and monetary relief pursuant to 29 U.S.C. § 2617(a)(1)(A) and (B), including, but not limited to, back pay and other lost economic benefits of employment, reinstatement or front pay in lieu of reinstatement, and reasonable attorney's fees and costs of litigation.

107.   Defendant acted purposely and with malice with intent to injure Plaintiff.

108.   Plaintiff also is entitled to liquidated damages for Defendants' willful violation of her rights under the FMLA. 29 U.S.C. § 2617(a)(1)(A)(iii).

109.   As a direct and proximate result of Defendant's actions and unlawful interference with Plaintiff's FMLA rights, Plaintiff has suffered severe damages.

110.   Plaintiff's employment was terminated and Plaintiff has incurred, and will continue to incur, substantial economic damages.

111.   Plaintiff is entitled to recover all appropriate relief afforded under the FMLA.

**COUNT VI**
**RETALIATION IN VIOLATION OF FMLA**

112.   Plaintiff incorporates by reference all the preceding paragraphs of the Complaint.

113.   Defendant is an employer covered by the FMLA pursuant to 29 U.S.C. § 2611(4)(A)(i).

114.   Plaintiff was an eligible employee under the FMLA pursuant to 29 U.S.C. § 2611(2).

115.   Following her surgery on March 14, 2017, Plaintiff was entitled to leave under the FMLA pursuant to 29 U.S.C. § 2612(a)(1), but Defendant engaged in prohibited conduct under the same by making ageist and threatening comments when she explained her need to convalesce and recover.

116.   On October 23, 2020, Ms. Elkins began to have monthly injections to treat her cancer, which she was entitled to under the FMLA pursuant to 29 U.S.C. § 2612(a)(1), but Defendant engaged in prohibited conduct Under the same by terminating her.

117.   By terminating Plaintiff's employment when she was entitled to take leave under 29 U.S.C. § 2612(a)(1)(C) and § 2612(a)(1)(D), and by considering her desire to take use of protected leave as a "motivating factor" in the decision to terminate her employment, among other actions, Defendant retaliated against Plaintiff because of her exercising the rights provided to her under the FMLA.

118.   The actions of Defendant in interfering with Plaintiff's leave under the FMLA were committed with reckless disregard for her right to take up to 12 workweeks of leave time because of her serious health condition and in violation of 29 U.S.C. § 2612(a)(1)(C) and § 2612(a)(1)(D).

119.   The effect of the actions of Defendant has been to deprive Plaintiff of a job, as well as income in the form of wages, health insurance, prospective retirement benefits, social security, and other benefits as a result of her right to leave under the FMLA.   Accordingly, and because the violations of the FMLA committed by Defendant, Plaintiff is entitled to both equitable and monetary relief pursuant to 29 U.S.C. § 2617 (a)(1)(A) and (B), including, but not limited to, back pay and other lost economic benefits of employment, reinstatement or front pay in lieu of reinstatement, and reasonable attorney's fees and costs of litigation.

120.   Defendant's prohibited conduct constitutes an unlawful retaliation against Plaintiff in violation of Plaintiff's rights under the FMLA pursuant to 29

U.S.C. § 2615 (a).

121.   Defendant acted purposely and with malice with intent to injure Plaintiff.  Plaintiff also is entitled to liquidated damages for the willful violation of her rights under the FMLA, 29 U.S.C. § 2671 (a)(1)(A)(iii).

122.   As a direct and proximate result of Defendant's actions and unlawful retaliation against Plaintiff, Plaintiff has suffered severe damages.

123.   Plaintiff's employment was terminated, and Plaintiff has incurred, and will incur, substantial economic damages.

124.   Plaintiff is entitled to recover all appropriate relief afforded under the FMLA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and that the following relief be granted:

A.   That this Court take jurisdiction of this matter;

B.   That process be served;

C.   That Plaintiff be awarded a declaratory judgment that Defendant violated the ADEA, the ADAAA, and the FMLA;

D.     That this Court enter a permanent injunction, prohibiting Defendant from engaging in unlawful employment practices in violation of the ADEA, the ADAAA, and the FMLA;

E.     That the Court award Plaintiff back pay and all benefits, privileges, and rights previously denied under the ADEA, the ADAAA, and the FMLA;

F.     That Plaintiff be reinstated to her former position with Defendant at the same pay rate, or in the alternative, front pay to compensate Plaintiff for lost future wages and benefits;

G.     That the Court award Plaintiff liquidated and/or double damages under the ADEA and FMLA for Defendant's willful violation of the law;

H.     That the Court award compensatory and punitive damages under the ADAAA in an amount to be determined by the trier of fact;

I.     That the Court award Plaintiff her costs in this action and reasonable attorneys' fees;

J.     That the Court grant to Plaintiff the right to have a trial by jury on all issues triable to a jury; and

K.     That the Court grant such additional relief as the Court deems proper and just.

Respectfully submitted this 9th day of March, 2021.

24

BUCKLEY BEAL, LLP

*s/Edward D. Buckley*
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleybeal.com
Thomas J. Mew IV
Georgia Bar No. 503447
tmew@buckleybeal.com

600 Peachtree Street NE
Suite 3900
Atlanta, Georgia  30308
Telephone:  (404) 781-1100
Facsimile:   (404) 781-1101

*Attorneys for Plaintiff*

## FONT AND POINT CERTIFICATION

The undersigned counsel for Plaintiff certifies that the within and foregoing

**COMPLAINT** was prepared using Times New Roman, 14-point font in  accordance

with LR 5.1(C).